OCTOBER 6, 2017; 10:00 A.M. Discretionary Review Denied by Supreme Court August 8, 2018
BRIEFS FOR APPELLANT: J. Paul Bradford, William E. Pinkston, Paducah, Kentucky.
ORAL ARGUMENT FOR APPELLANT: J. Paul Bradford, Paducah, Kentucky.
BRIEF FOR APPELLEE: Craig Housman, Paducah, Kentucky, Stephen D. Gray, Henderson, Kentucky.
ORAL ARGUMENT FOR APPELLEE: Craig Housman, Paducah, Kentucky.
BEFORE: COMBS, D. LAMBERT AND THOMPSON, JUDGES.
OPINION
THOMPSON, JUDGE:
This case arises from a tragic school bus crash in which a child was killed and several passengers were injured, including Donna Wilson. The driver of the bus, Anita Roach, appeals from a judgment of the Carlisle Circuit Court entered after a jury verdict awarding $1,910,347 to Donna and her husband, Michael Wilson. The issues presented concern whether Roach is entitled to fellow-employee immunity pursuant to the Worker's Compensation Act (the Act). Roach argues the trial court erred when it ruled that the claims were not barred by the immunity afforded fellow employees under the Act and challenges the sufficiency of the evidence to support the jury's findings that Roach was voluntarily intoxicated or that she knowingly and falsely represented her physical condition or medical history on her employment application. We conclude that fellow-employee immunity under the Act does not apply when an employee causes injury as a result of acts outside the scope and course of employment and there was sufficient evidence to support the jury's finding that Roach was voluntarily intoxicated while operating the school bus involved in the crash.
On May 16, 2011, Roach, an employee of the Carlisle County Board of Education, was driving a school bus on a field trip for elementary students at Carlisle Elementary School when the bus left the roadway and fell into a ravine. Donna was on the bus and also an employee of the Board.
The buses departed the elementary school sometime between 8:30 and 9:00 a.m. and arrived at the first destination, the Paducah Athletic Club, in approximately thirty minutes. After unloading the students and teachers, the bus drivers went to a nearby convenience store. Roach testified that she took a diuretic at the store. Another bus driver, Kathy Meinders, testified she observed Roach take *452 pills but did not know the type of medication.
After loading the students and teachers back on the bus, the field trip continued to a restaurant. The students, teachers and bus drivers arrived at the restaurant at 11:30 a.m. There was no testimony that Roach engaged in any unusual behavior at the restaurant.
After lunch, the field trip buses departed for the school. The crash occurred at approximately 1:30 p.m. while the bus traveled on U.S. Highway 62. A witness who followed the bus testified that Roach was not exceeding the speed limit. She observed the bus crest a small hill and then drift off the roadway without swerving. She testified there were no brake lights from the bus.
Thomas Clifton of the Kentucky State Police investigated the scene. He concluded the bus left the roadway at a steady, gradual four-degree angle. The first place he saw evidence of any steering input was 182 feet further down the roadway from the point where the right front tire of the bus ran off the roadway. He testified that Roach overcorrected causing the bus to slide sideways across the highway and overturn.
Clifton testified that in an interview, Roach stated there was a deer approaching the highway and she swerved. However, Clifton testified that upon inspection of the surrounding scene, he was unable to find any deer tracks and several witnesses on the roadway at the time of the bus crash did not see any deer immediately before the crash. Clifton, who has training in accident reconstruction and was permitted to testify as an expert in that field, opined that Roach did not attempt to steer the bus back onto the roadway until near the end of the bus's path on the right shoulder. He testified the circumstances of the accident were consistent with a driver dozing off.
Reconstructionist Jerry Pigman agreed that the bus departed the roadway at a four-degree angle. However, he testified there was evidence of steering input by Roach within a short time after the bus left the roadway. He testified that the evidence at the scene supported Roach's testimony that, to avoid a deer, she turned the bus slightly to the right but inadvertently went off the road. She then turned the wheel sharply to the left causing her to lose control of the bus which then slid across the roadway and rolled clockwise into a deep ditch.
Witnesses on the bus, including Donna, testified they did not see any deer and testified that the bus did not move in a sudden evasive manner. Donna testified that just prior to the accident, Roach appeared to be in a trance and did not react when the bus left the roadway.
Much of the evidence at trial concerned whether Roach, who had undergone back surgery and returned to work on March 15, 2010, was under the influence of prescription medications at the time of the accident. Roach had been prescribed Lortab 10's along with Klonopin, Gabapentin and Prozac. There was further evidence that Roach had been warned by her physician not to take Lortab before or while operating a school bus.
In March 2010, Dr. Sanchez, Roach's regular family physician, diagnosed her to be suffering from opiate withdrawal symptoms and attempted to wean her from the drug. On April 9, 2010, Roach requested pain medicine and nerve medicine. Dr. Sanchez increased her nerve medicine but, believing Roach was dependent on opiates, did not write a prescription for Lortab. On April 28, 2010, Roach filled a prescription for 10 Lortab 10's written by a different doctor, Dr. McDonald.
*453 Pharmaceutical records introduced revealed that from March 15, 2010 through May 16, 2011, Roach filled prescriptions for 1,610 opiate pills, including one-hundred Lortab 10's on May 13, 2011, three days prior to the accident. Roach obtained prescriptions for Lortab from five different physicians during a fourteen-month time frame.
Dr. Kelly Clark, a psychiatrist sub-specializing in addiction medicine, reviewed Roach's medical and pharmaceutical records and the medical depositions. She opined that Roach was addicted to Lortab at the time of the crash, testifying that Roach's medical records documented a pattern of chemical dependence. She testified that a patient on opiate medications may not show signs of impairment, yet be susceptible to drowsiness, impaired judgment and delayed reaction time.
The Wilsons introduced into evidence the American College of Occupational and Environmental Medicine guidelines published in July of 2014 in the Journal of Occupational and Environmental Medicine. The studies resulted in a recommendation against chronic opioid use for patients who perform safety sensitive jobs noting a substantial increase in the incident of motor vehicle accidents among drivers on prescribed opiate medications.
Following the accident, blood samples taken from Roach were sent to the Kentucky State Police Central Laboratory (KSP laboratory). A report by the KSP laboratory indicated that Roach's blood contained 27 nanograms/milliliter (ng/mL) of Fluoxetine (Prozac ). A separate report by NMS Labs indicated that Roach's blood contained 3.3 ng/mL of Clonazepam (Klonopin ) and that her urine contained 120 ng/mL of Lortab. Both parties produced experts to testify about the results.
On the day of the crash, a blood sample was taken from Roach at 4:30 p.m. Dr. Saeed Jortani testified that if Roach had taken two Lortabs earlier in the day, a blood sample taken at 4:30 p.m. would not be expected to show the presence of hydrocodone. He explained that the KSP laboratory at the time Roach's blood was analyzed used a thirty nanogram per milliliter cutoff limit to detect hydrocodone and Roach's blood level would have been below that limit if she consumed two Lortab 10's that morning.
After review of Roach's medical record, pharmacy records and trial depositions, Dr. Jortani opined that on May 16, 2011, Roach was chemically dependent on Lortab. The side effects of Lortab alone or combined with the drugs Roach was taking are drowsiness, diminished reaction time and impaired judgment, which can occur even though the person can walk and speak without slurred speech.
Dr. Jonathan Lipman, a neuropharamacologist, testified on Roach's behalf. He testified that the blood and urine samples taken from Roach on the day of the accident would exclude her as a Lortab abuser. In his opinion, the medication Roach was prescribed would not have impaired her when driving the bus.
The Wilsons also introduced evidence that Roach had consistently denied her use of Lortab including when completing forms required for her employment for the 2010-2011 school year. In June 2010, Roach completed a health history questionnaire to obtain her updated medical card and CDL license needed to be rehired for driving a bus for the 2010-2011 school year. She checked "no" in response to a question regarding narcotic or habit-forming drug use despite the fact that she had been diagnosed as suffering from withdrawal from Lortab just under three months earlier.
*454 Dr. Zetter, who signed Roach's June 4, 2010 medical recertification, was unaware that Dr. Sanchez had diagnosed Roach with opiate withdrawal symptoms. He testified that proper response to the question on the CDL physical exam report regarding narcotic use should have been "yes."
Dr. Zetter referred Roach to Dr. Gina Walton, a physiatrist, to address Roach's increasing low back complaints. In the patient questionnaire, Roach did not list Lortab as a medication she was taking. After Dr. Walton indicated she would not prescribe any long-term narcotics, Roach did not return for future appointments. Roach continued to obtain Lortab prescriptions from Dr. Zetter.
Roach testified that she never took Lortab 10's while operating a school bus and only took them at night. She testified that she destroyed many of the Lortab 10's even though she paid the copayments for more than 1,600 pills over fourteen months. Roach testified that a deer caused her to swerve and lose control of the bus.
Roach acknowledged that she was required to complete the physical exam questionnaires accurately, truthfully and completely. She testified she did not know Lortabs were opiate medications and was never told they were habit forming.
At the close of the Wilsons' evidence and again at the close of her case, Roach moved for a directed verdict on the basis that the Act afforded her immunity and that the Wilsons had not produced sufficient evidence to support a verdict in their favor, which were denied. After the jury returned its verdict and a judgment was entered, Roach appealed.
Roach argues that the civil actions against her are precluded by the immunity given under Kentucky Revised Statutes (KRS) 342.690(1) to fellow employees. That statute not only provides immunity from civil actions to employers by making compensation under the Act an employee's exclusive remedy, but it also provides the same immunity to employees. It provides in part:
The exemption from liability given an employer by this section shall also extend to such employer's carrier and to all employees, officers or directors of such employer or carrier, provided the exemption from liability given an employee, officer or director or an employer or carrier shall not apply in any case where the injury or death is proximately caused by the willful and unprovoked physical aggression of such employee, officer or director.
Roach contends that the only exception to the immunity afforded to a fellow employee under the statute is when the injury is caused by that employee's willful and unprovoked act of aggression and that neither her voluntary intoxication nor false representations to the Board regarding her opiate use fall within that limited exception. The Wilsons argue that under Kentucky law, the immunity afforded by KRS 342.690(1) is only available if the injured worker and the fellow employee were acting within the scope and course of their employment when the injury occurred. We agree with the Wilsons that Roach's voluntary intoxication removed her from the scope and course of her employment and, therefore, the immunity provision does not apply.
The rules applicable to construing the Act are the same general rules applicable when construing all statutes.
In construing statutes, our goal, of course, is to give effect to the intent of the General Assembly. We derive that intent, if at all possible, from the language the General Assembly chose, either as defined by the General Assembly or as generally understood in the context *455 of the matter under consideration. We presume that the General Assembly intended for the statute to be construed as a whole, for all of its parts to have meaning, and for it to harmonize with related statutes.
Shawnee Telecom Res., Inc. v. Brown, 354 S.W.3d 542, 551 (Ky. 2011) (citation omitted).
As noted in Livingood v. Transfreight, LLC , 467 S.W.3d 249, 258 (Ky. 2015), "KRS Chapter 342 evinces a legislative intent that an employee should not benefit from his own wrongdoing." That intent is embodied in KRS 342.610(3) which provides that "[l]iability for compensation shall not apply where injury, occupational disease, or death to the employee was proximately caused primarily by voluntary intoxication as defined in KRS 501.010, or by his or her willful intention to injure or kill himself, herself, or another." In Advance Aluminum Co. v. Leslie, 869 S.W.2d 39, 40 (Ky. 1994), the Court explained that " KRS 342.610(3) encompasses situations including horseplay, intoxication, or other employee conduct shown to have been an intentional, deliberate action with a reckless disregard of the consequences either to himself or to another." Consistent with the Act's requirement that an injury arises in the scope and course of employment, an employee's injury proximately caused by voluntary intoxication is not compensable. The question is whether voluntary intoxication also precludes an employee from claiming fellow-employee immunity.
Before the fellow-employee immunity granted by KRS 342.690(1) was effective, fellow-employee immunity was recognized in case law. In Miller v. Scott , 339 S.W.2d 941 (Ky. 1960), the Court held that the Act prohibited a common law action by an injured employee against a fellow employee who negligently caused the injury when both employees were acting within the scope and course employment at the time of the injury. However, it did not address the situation where the fellow employee was not entitled to compensation under the Act. That issue would not be addressed until ten years later.
In Jackson v. Hutchinson , 453 S.W.2d 269, 270 (Ky. 1970), the Court held that the "test of fellow-employee immunity is whether each of the employees involved would have been entitled to workmen's compensation benefits for any disabling injury suffered in the accident." The Court noted that the test "leads to consistent application of the fellow-employee immunity rule." Id. The test was reaffirmed in Wallace v. Wathen, 476 S.W.2d 829, 831 n.2 (Ky. 1972) (citation omitted), where the Court explained:
[The] test of fellow-employee immunity is whether each of the employees involved would have been entitled to workmen's compensation benefits for any disabling injury suffered in the accident. This test excludes from the classification of fellow-employee one whose negligent act is unrelated to the employment out of which an injury arises.
After Jackson and Wallace , KRS 342.690(1) was amended to include the "willful and unprovoked aggression" language. In Kearns v. Brown , 627 S.W.2d 589 (Ky. App. 1982), the Court was presented with and rejected the same argument now advanced by Roach that KRS 342.690(1) provides immunity to a fellow employee even if that employee is not entitled to compensation under the Act.
In Kearns , an employee was killed when he was a passenger in a vehicle operated by a fellow employee who was engaged in "horseplay" with an approaching vehicle and, therefore, not entitled to benefits under the Act. Addressing the effect of KRS 342.690(1) on case law which preexisted *456 the statutory immunity granted, the Court framed the issue as follows:
In this case it is contended that appellee, by his rash conduct at the time of the accident, had removed himself from the course of his employment and therefore the immunity provisions of the act do not apply to him. Reduced to its basics, the proposition is whether the fellow employee immunity provided by KRS 342.690 is applicable to all cases in which the injured worker sustains an injury arising out of and in the course of his employment or whether the immunity is limited to instances in which the injured worker and the fellow employee whose negligence caused the injury were both acting in the course of their employment.
Id. at 590.
The Court observed that the statute refers only to the status of the injured worker and "[t]he only apparent exception is in cases of willful and unprovoked aggression." Id. However, it held that the test in Jackson and Wallace for fellow-employee immunity remained the same. The Court held:
It seems to be the general rule that compensation is not recoverable for injuries sustained through horseplay, done independently of and unconnected with the work of employment. Consequently, if appellee was engaging in the type of horseplay conceded for the purpose of the motion for summary judgment, it is quite likely that he could not have recovered compensation for injuries he might have sustained in the accident and therefore he would not meet the test for immunity[.]
Id. at 591 (citation omitted). The Court's reasoning was based on the premise that to trigger coverage under the Act and the immunity provisions of KRS 342.690(1), the fellow employee must be acting within the scope and course of employment.
[T]he immunity provisions of KRS 342.690 are not applicable to a fellow employee whose actions are so far removed from those which would ordinarily be anticipated by the employer that it can be said that the employee causing the injury has removed himself from the course of his employment or that the injury did not arise out of the employment.
Id . In Russell v. Able , 931 S.W.2d 460, 462 (Ky. App. 1996), the Court held that the same test applies even if the injured employee receives worker's compensation benefits.
Roach argues that the test recited in Kearns is based on pre-1973 case law and is a misinterpretation of KRS 342.690(1), which we should overrule. While the Kearns Court relied on case law decided prior to the addition of language, "the willful and unprovoked aggression" that precise language was considered by the Court in 1982 when it decided Kearns . Since that time, this Court has continued to apply the test set forth in Kearns to conclude that fellow-employee immunity under the Act is applicable only if the fellow employee was acting within the scope and course of employment, which is a threshold requirement for application of the Act.
In Haines v. BellSouth Telecommunications, Inc. , 133 S.W.3d 497 (Ky. App. 2004), the injured employee filed an action against his employer and supervisor after his supervisor sounded a boat horn within one foot of the employee causing him hearing loss and permanent nerve damage. Relying on the Kearns test, the Court noted the "key factual issue in determining whether the immunity provided under KRS 342.690(1) applies is whether the fellow employee's act falls within the scope of *457 employment." Id. at 500. It was concluded that the supervisor was entitled to immunity under KRS 342.690(1) because boat horns were used in the workplace as a motivational tool and to provide a fun and exciting environment. Id. There was no evidence that the supervisor sounded the horn with any improper intent so as to remove himself from the course of his employment. Id. at 500-01.
The Supreme Court cases cited by Roach, Travelers Indemnity Co. v. Reker , 100 S.W.3d 756 (Ky. 2003) and Shamrock Coal Co., Inc. v. Maricle , 5 S.W.3d 130 (Ky. 1999), do not persuade this Court that the precedent established by Kearns is no longer good law. In those cases, the Court held that the exclusive remedy provision in KRS 342.690(1) as applied to employers or insurance carriers is absolute and the willful and unprovoked aggression provision is the sole exception to immunity from civil suit. However, neither case involved the question of whether a fellow employee was acting within the scope and course of employment and, consequently, the issue of whether the Act applies at all was not presented.
Roach argues that if the action was not precluded as a matter of law under KRS 342.690(1), there was insufficient evidence to support the jury's finding that she was voluntarily intoxicated. Although to avoid the fellow-employee provisions of the Act and to recover damages the Wilsons were required to prove Roach was not a covered employee under the Act, this was a civil action, not an administrative action. Therefore, our review is as in any other jury trial where the sufficiency of the evidence and the inferences that may reasonably be drawn are contested. "[W]e are constrained to view the sufficiency of the evidence in the light most favorable to the verdict. The prevailing party is entitled to all reasonable inferences which may be drawn from the evidence." Saint Joseph Healthcare, Inc. v. Thomas , 487 S.W.3d 864, 868 (Ky. 2016).
Voluntary intoxication is defined in KRS 501.010(4) as "intoxication caused by substances which the defendant knowingly introduces into his body, the tendency of which to cause intoxication he knows or ought to know, unless he introduces them pursuant to medical advice or under such duress as would afford a defense to a charge of crime." Roach argues there was no evidence from which a reasonable inference could be drawn that she experienced a disturbance of her mental or physical capacities at the time of the accident. She points to witness testimony that Roach did not act abnormally on the day of the accident and that the toxicological test results were inconclusive that Roach was intoxicated at the time of the accident. Not surprisingly, she believes her expert, Dr. Lipman, was more credible than the medical experts produced by the Wilsons.
It would not be beneficial for this Court to redundantly recite the evidence. When viewed most favorably to support the verdict, the evidence was more than sufficient to support the verdict. Even in criminal cases where the more stringent beyond a reasonable doubt standard is applied rather than the preponderance of the evidence standard applied here, the nature of the collision and other circumstantial evidence are sufficient to support a reasonable inference of driver impairment. See Berryman v. Commonwealth , 237 S.W.3d 175, 178 (Ky. 2007). Moreover, which witnesses to believe or disbelieve are credibility matters within the exclusive province of the jury. Spalding v. Shinkle, 774 S.W.2d 465, 467 (Ky. App. 1989). There was more than sufficient evidence that Roach was prescribed Lortab, was addicted to Lortab, contrary to medical advice took Lortab while operating the school bus, and the bus *458 departed the roadway and crashed into a ravine because of the effect of her voluntary intoxication.
We do not need to address the issue of whether the false information provided by Roach to the Board concerning her Lortab use is supported by substantial evidence or whether, alone, the jury's finding on that issue would render KRS 342.690(1) inapplicable. The jury was instructed that Roach had the duty to have the bus under reasonable control and exercise the highest degree of care to avoid the accident. The jury found that her failure to comply with one or more of those duties was a substantial factor in causing the bus to crash. The evidence supports the jury's findings. We conclude that voluntarily intoxication while operating a school bus was an act "so far removed" from that which would be ordinarily be anticipated by the Board that Roach removed herself from the course of her employment. Kearns , 627 S.W.2d at 591.
Accordingly, the judgment of the Carlisle Circuit Court is affirmed.
ALL CONCUR.